Kelly GALLAGHER, Donovan K. Gallagher, Barth Robinson, Gretchen Robinson, William Van Gelderen, Susan Larsen, Brad Larsen, Harold Wardell, and Mary C. Wardell, personally and on behalf of two classes of similarly situated persons, Plaintiffs–Appellants,

P. Constable, D. Constable, F.G. Maestas, D.R. Maestas, Chris Fornelius, Kim Sloan, Richard S. Allen, Jr., Laura A. Allen, Plaintiffs,

v.

"NEIL YOUNG FREEDOM CONCERT," Rick James, Director of the Huntsman Center, University of Utah, United Concerts, Inc., a corporation, Contemporary Services Corporation, a California corporation, Richard Roes 1–6, Jane Does 1 through 12, and John Does 1 through 12, Defendants–Appellees.

No. 93–4122.

United States Court of Appeals,
Tenth Circuit.

Feb. 28, 1995.

Brian M. Barnard (John Pace with him, on the briefs), Utah Legal Clinic, Salt Lake City, UT, for plaintiffs-appellants.

Paul S. Felt (Cameron M. Hancock with him, on the brief), Ray, Quinney, & Nebeker, Salt Lake City, UT, for defendant-appellee Rick James.

Raymond M. Berry, Richard A. Van Wagoner, Snow, Christensen, & Martineau, Salt Lake City, UT, for defendant-appellee United Concerts, Inc. Tracy H. Fowler, Campbell, Maack, & Sessions, Salt Lake City, UT, for defendant-appellee Contemporary Services Corp. with him, on the brief.

Before SEYMOUR, Chief Judge, HENRY, Circuit Judge, and DAUGHERTY, Senior District Judge.*

HENRY, Circuit Judge.

Appellants challenge the district court's order granting summary judgment against them in an action filed pursuant to 42 U.S.C. § 1983. They assert that, prior to entering an arena on the University of Utah campus to attend a concert, they were subjected to unreasonable pat-down searches in violation of the Fourth Amendment. The district court found that because the searches were conducted by employees of a private security company, they did not constitute the state action necessary to support a Section 1983 claim.

We review the district court's grant of summary judgment de novo, applying the same standard as the district court under Fed.R.Civ.P. 56(c). *Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir.1991). Summary judgment is warranted when there is no dispute over the material facts such that the moving party is entitled to judgment as a matter of law. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). The court must view the evidence in the light most favorable to the nonmoving party. *Id.*

For the reasons set forth below, we affirm the decision of the district court.

## I. BACKGROUND

On March 20, 1991, singer Neil Young performed a concert at the John M. Huntsman Center on the University of Utah campus in Salt Lake City, Utah. The defendant-appellee United Concerts, Inc., promoted the concert and leased the Huntsman Center from the University on the evening of the

* The Honorable Frederick A. Daugherty, Senior United States District Judge for the Northern, Eastern, and Western Districts of Oklahoma, sitting by designation.

concert. United Concerts hired the defendant-appellee Contemporary Services Corp. to provide certain security services for the concert.

United Concerts negotiated the lease of the Huntsman Center pursuant to a University operations manual that required sponsors of events to offer a discount to University students, faculty, and staff and to pay specified rental charges and direct expenses incurred by the University. The manual also stated that the requirements for "support personnel" for each Huntsman Center event, including police and internal security, "shall be determined by the Director after consultation with the sponsor of the event." Aplt. App. at 268. The manual explained the University's obligation to provide security as follows:

The University Public Safety department shall provide, for each JMHC event, qualified personnel for crowd control, building security, public safety and fire control, traffic control, and any other services at the cost of the sponsoring organization.

Aplt.App. at 270.

United Concerts' lease established a base rental charge as well as an additional fee calculated as a percentage of gross ticket sales up to a maximum amount. The lease stated that United Concerts was responsible for costs incurred by the University in providing certain support personnel for the concert, including sound technicians, electricians, and ushers. It also stated that United Concerts would pay the University an hourly fee for security and police services provided by officers from the University's Department of Public Safety.

Prior to the concert, United Concerts contacted Contemporary Services, and the two companies entered into an oral contract under which Contemporary Services agreed to provide crowd management services for the concert. United Concerts had contracted with Contemporary Services to provide similar services for other concerts, including several concerts at the Huntsman Center at which pat-down searches were performed. The decision to hire Contemporary Services for security for the Neil Young concert was made by United Concerts personnel and not

by University officials. However, the lease reflected United Concerts' decision, stating that United Concerts would supply and pay crowd management personnel and specifically designating Contemporary Services as the firm that would provide crowd management. Aplt.App. at 263.

Contemporary Services had previously adopted a written policy that provided, "For 'rock', [sic] 'rap' or a 'go-go' concert, we will always conduct a full pat down search." Aplt.App. at 286. Contemporary Services' policy described the procedure for conducting these searches and listed the items that were not allowed at most events. Prohibited items included bottles, cans, cameras, drugs, tape recorders, video cameras, and weapons. Aplt.App. at 286. Representatives from Contemporary Services indicated that the company's practice was to follow this policy unless specifically directed to do otherwise by the firm that hired it. The defendant-appellee Rick James, in his capacity as Director of the Huntsman Center, had previously hired Contemporary Services directly to provide security at several events at the Huntsman Center. Pat-down searches were not performed at those University-promoted events.

Approximately two weeks before Mr. Young's Huntsman Center performance, representatives of United Concerts, Contemporary Services, and the University met to discuss arrangements for the concert. United Concerts representatives directed Contemporary Services personnel to perform the pat-down searches generally performed by Contemporary Services at rock concerts. At a meeting held approximately two hours before the concert, United Concerts representatives discussed the procedures for the pat-down searches with Contemporary Services personnel and with University officials. According to United Concerts officials, Mr. James was present at both meetings. Mr. James acknowledged that he attended the meeting on the day of the concert, but did not remember attending the earlier meeting.

On March 20, 1991, outside the Huntsman Center, Contemporary Services employees performed pat-down searches of individuals

attending the concert.[1] Contemporary Services employees wore yellow jackets with the initials "C.S.C." on the front and the words "Event Staff" on the back. They sought to discover the items specifically barred from the concert by Contemporary Services' policy.[2] Uniformed officers from the University's Department of Public Safety observed entering concert patrons from inside the Huntsman Center, approximately six to ten feet away. According to Contemporary Services officials, their employees distributed fliers to the concert patrons informing them of the items that would not be allowed in the Huntsman Center. Contemporary Services officials also indicated that their employees informed concert patrons if they did not wish to be searched they could obtain a refund of the ticket price. However, several concert patrons stated that they were never informed of this opportunity to obtain a refund. After the concert began, Contemporary Services employees assisted University officers with security and crowd control inside the building.

Approximately 8,000 people attended the Neil Young concert at the Huntsman Center. After collecting the revenue from ticket sales and deducting appropriate amounts for sales taxes, rental charges, and direct expenses incurred, the University paid United Concerts $112,282.51. The rental charges retained by the University totalled $11,500.00.

The appellants, a group of individuals who attended the Neil Young concert and were subjected to pat-down searches before entering the Huntsman Center, filed this action alleging that the searches violated the

Fourth Amendment to the United States Constitution and Article I, § 14 of the Utah Constitution. They named Mr. James, United Concerts, and Contemporary Services as defendants. The district court dismissed the appellants' state law claims without prejudice and granted summary judgment in favor of all the defendants on the Fourth Amendment claims, reasoning that the pat-down searches did not constitute state action and were not performed under color of law. Invoking the various tests for state action, the appellants contend that the district court erred in reaching this conclusion.

## II. DISCUSSION

 The Fourteenth Amendment to the United States Constitution provides in part: "No State shall ... deprive any person of life, liberty, or property, without due process of law." That language establishes an "essential dichotomy" between governmental action, which is subject to scrutiny under the Fourteenth Amendment, and private conduct, which " 'however discriminatory or wrongful,' " is not subject to the Fourteenth Amendment's prohibitions. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 452–53, 42 L.Ed.2d 477 (1974) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948)). Fourth Amendment jurisprudence establishes this same distinction: only unreasonable searches and seizures conducted by the government and its agents are prohibited. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984);

1. In the district court proceedings, several of the appellants presented affidavits stating that the pat-down searches were performed by individuals wearing clothing identifying them as working for the University and the Huntsman Center. Aplt.App. at 27, 33. The appellants did not specify the identifying information on the clothing. However, at a hearing before the district court, appellants' counsel acknowledged that the individuals performing the challenged searches wore jackets with the initials "C.S.C." on the front and "Event Staff" on the back. Aple.App. at 335–36. In addition, appellants' counsel acknowledged that Contemporary Services employees conducted all of the challenged searches. *Id.*

2. One of the appellants stated that the individual performing the search "patted down my arms

and legs, my groin, my underarms and my torso." Aplt.App. at 32. Another appellant stated that she was six months pregnant when she attended the concert and that the female employee of Contemporary Services who conducted the search "patted down my entire stomach at least twice and kept insisting that my stomach was 'too hard.' " Aplt.App. at 38.

It should be noted that, under Utah tort law, a plaintiff may recover on a claim for battery if she has been subjected to an intentional, unprivileged touching that is harmful or offensive. *See D.D.Z. v. Molerway Freight Lines*, 880 P.2d 1, 3 (Utah App.1994); *Matheson v. Pearson*, 619 P.2d 321, 322 n. 1 (Utah 1980). Whether the pat-down searches constituted battery under Utah law is a question not presented for our review.

*Pleasant v. Lovell,* 876 F.2d 787, 796 (10th Cir.1989).

The statute that provides a remedy for constitutional violations committed by state officials, 42 U.S.C. § 1983, establishes a similar dichotomy. Under Section 1983, liability attaches only to conduct occurring "under color of law." Thus, the only proper defendants in a Section 1983 claim are those who " 'represent [the state] in some capacity, whether they act in accordance with their authority or misuse it.' " *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 462, 102 L.Ed.2d 469 (1988) (quoting *Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961)). Accordingly, the conduct that constitutes state action under the Fourth and Fourteenth Amendments necessarily constitutes conduct "under color of law" pursuant to Section 1983. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935, 102 S.Ct. 2744, 2752, 73 L.Ed.2d 482 (1982).

The Supreme Court has identified several principles underlying the constitutional distinction between governmental action and private conduct. First, it "preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Id.* at 936, 102 S.Ct. at 2753. Second, it "avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Id.*

Application of the state action doctrine has been characterized as " 'one of the more slippery and troublesome areas of civil rights litigation.' " *International Soc'y for Krishna Consciousness, Inc. v. Air Canada,* 727 F.2d 253, 255 (2d Cir.1984) (per curiam) (quoting *Graseck v. Mauceri,* 582 F.2d 203, 204 (2d Cir.1978), *cert. denied* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 91 (1979)). Other commentators have found the doctrine to be "the paragon of unclarity," Charles L. Black, Jr., *The Supreme Court, 1966 Term—Foreword: "State Action," Equal Protection, and California's Proposition 14,* 81 Harv.L.Rev. 69, 89 (1967); and a "protean concept," Thomas P. Lewis, *The Meaning of State Action,* 60 Colum.L.Rev. 1083, 1085 (1960). The Supreme Court has acknowledged that the determination as to whether particular conduct constitutes state action "frequently admits of no easy answer." *Jackson,* 419 U.S. at 350, 95 S.Ct. at 453.

The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case. In some instances, the Court has considered "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453. The Court has also inquired whether the state has "so far insinuated itself into a position of interdependence" with the private party, *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 861–62, 6 L.Ed.2d 45 (1961), that there is a "symbiotic relationship" between them, *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 175, 92 S.Ct. 1965, 1972–73, 32 L.Ed.2d 627 (1972). In addition, the Court has held that if a private party is " 'a willful participant in joint activity with the State or its agents,' " then state action is present. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–06, 26 L.Ed.2d 142 (1970) (quoting *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966)). Finally, the Court has ruled that a private entity that exercises "powers traditionally exclusively reserved to the State" is engaged in state action. *Jackson,* 419 U.S. at 352, 95 S.Ct. at 454. *See generally* 1 Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation: Claims, Defenses, and Fees,* §§ 5.10 to 5.15 (2d ed. 1991) (explaining various tests for state action).

Under each of these four tests, "the conduct allegedly causing the deprivation of a federal right" must be "fairly attributable to the State." *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753–54. In order to establish state action, a plaintiff must demonstrate that the alleged deprivation of constitutional rights was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Id.* In addition, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* In order to

resolve the state action question before us, we will apply these general principles and each of the tests articulated by the Supreme Court.

### A. Nexus Test

Under the nexus test, a plaintiff must demonstrate that "there is a sufficiently close nexus" between the government and the challenged conduct such that the conduct "may be fairly treated as that of the State itself." *Jackson*, 419 U.S. at 351, 95 S.Ct. at 453. Under this approach, a state normally can be held responsible for a private decision "only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982). The test insures that the state will be held liable for constitutional violations only if it is responsible for the specific conduct of which the plaintiff complains. *Id.*

As is the case with all of the various tests for state action, the required inquiry is fact-specific. Nevertheless, the Supreme Court has established a number of important general principles. First, the existence of governmental regulations, standing alone, does not provide the required nexus. *Id.* at 1004, 102 S.Ct. at 2785–86; *Jackson*, 419 U.S. at 350, 95 S.Ct. at 453. Similarly, the fact that a private entity contracts with the government or receives governmental funds or other kinds of governmental assistance does not automatically transform the conduct of that entity into state action. *Rendell–Baker v. Kohn*, 457 U.S. 830, 840–42, 102 S.Ct. 2764, 2770–71, 73 L.Ed.2d 418 (1982); *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 544, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 (1987) ("The Government may subsidize private entities without assuming constitutional responsibility for their actions."). Finally, under the nexus test, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Id.* 457 U.S. at 1004–05, 102 S.Ct. at 2786.

*Blum* illustrates the application of the nexus test. There, the plaintiffs alleged that decisions made by nursing homes to discharge or transfer patients without notice or an opportunity for a hearing violated their due process rights under the Fourteenth Amendment. They named as defendants the Commissioners of the New York Department of Social Services and the Department of Health.

The Supreme Court concluded that the plaintiffs had failed to establish the necessary state action. In reaching that conclusion, the Court examined various statutes, regulations, and state constitutional provisions that: (1) required nursing home physicians to complete state-devised forms concerning patients' health; (2) required nursing homes to make all possible efforts to transfer patients to appropriate levels of care; (3) authorized the state to assess fines against facilities that violated applicable regulations; (4) required the state to approve or disapprove continued payment of Medicaid benefits to nursing homes on the basis of decisions to discharge or transfer particular patients; and (5) authorized the New York Legislature to provide funds for the care of the needy. The Court concluded that none of these provisions demonstrated that state officials were responsible for the decision to discharge or transfer specific patients. *Id.* at 1008, 102 S.Ct. at 2787–88. Instead, it reasoned, "Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." *Id.*

In *Gilmore v. Salt Lake Community Action Program*, 710 F.2d 632 (10th Cir.1983), we applied the nexus test to a due process claim brought by a discharged employee of a community action agency. Although we found that the agency could fairly be considered a state actor, we concluded that the discharged employee had failed to establish state action. We reasoned that there was no indication that a state official participated in the decision to terminate the plaintiff or that a state policy resulted in the decision. Because the decision to discharge the plaintiff was made by a private employee without

reference to state standards or rules, the required nexus was lacking. *Id.* at 638–39.

Several other courts of appeals have applied the nexus test to alleged constitutional violations arising out of leases of government owned facilities. For example, in *Wagner v. Metropolitan Nashville Airport Auth.*, 772 F.2d 227 (6th Cir.1985), an airline passenger alleged that a baggage search violated his Fourth Amendment rights. He sued the municipal authority that owned the airport where the search occurred, the airline on which he flew (which leased a section of the airport from the airport authority), the woman who conducted the search, and the woman's employer, a private security company hired by the airline. The plaintiff claimed that the federal regulations that required airport operators to present security plans to the Federal Aviation Administration established the required nexus. The *Wagner* court rejected this argument, reasoning that under applicable regulations the airport was responsible for "overall base security operations," but did not regulate the airline security program that directly resulted in the search. *Id.* Significantly, the court added that even if the municipal airport authority had the authority to regulate, approve, and disapprove the private airline's security program, "such a tenuous connection would still not rise to the level of significant state involvement." *Id.*

The Eleventh Circuit reached a similar conclusion in *NBC v. Communications Workers of America, AFL–CIO*, 860 F.2d 1022 (11th Cir.1988). There, the plaintiff broadcasting company filed suit to enjoin the defendant union from excluding it from a meeting held in a facility leased from a municipality. Like the Sixth Circuit in *Wagner*, the Eleventh Circuit applied the nexus test and found no state action, concluding that the city's execution of the lease was not sufficient to implicate it in the decision to exclude the broadcasting company from the convention. It added that there was no indication in the record that city officials had actually participated in the challenged decision.

In contrast, in *D'Amario v. Providence Civic Center Auth.*, 783 F.2d 1 (1st Cir.1986), the First Circuit found state action. There, a commercial photographer alleged that a policy barring photographic equipment from certain performances at the Providence Civic Center, a municipally owned building, violated his First Amendment rights. The plaintiff photographer named as defendants the Providence Civic Center Authority, a public corporation created by the state to operate the Civic Center, and a promotion company that leased the Civic Center from the Authority for specific events. The defendants argued that because the policy barring photographic equipment from the Civic Center was enforced only when certain performers demanded its inclusion in their contracts with the concert promoter, there was no state action. The court rejected this argument, reasoning that although the policy arose out of negotiations between two private parties (the performer and the promoter), "the *enforcement* of the 'no camera' rule by the Civic Center employees supplies the state involvement nexus." *Id.* at 3.

The Supreme Court's analysis in *Blum*, our decision in *Gilmore*, and the decisions of the First, Sixth, and Eleventh Circuits under analogous factual scenarios frame our application of the nexus test to this case. Following the reasoning of these decisions, we must determine whether there was a sufficiently close nexus between University rules, policies, decisions, and actions and the pat-down searches outside the Huntsman Center.

The appellants maintain that the following factors establish the requisite nexus: (1) the sections of the Huntsman Center's operations manual and the parts of the job description of its Executive Director that, according to the appellants, established a duty to provide security; (2) the fact that Mr. James was aware of the decision to perform pat-down searches; and (3) observation of the pat-down searches by University Department of Public Safety officers. These factors are insufficient to establish the requisite nexus.

As to the first factor, appellants rely on the provisions of the Huntsman Center's operations manual that stated that officers from the University's Department of Public Safety "shall provide security" at Huntsman Center events. They also note that the Uni-

versity's job description for the Executive Director of the Huntsman Center provided that the Director was ultimately responsible for final decisions regarding the number of support personnel, including security officers, at Huntsman Center events.

Following *Blum, Gilmore,* and cases from other circuits regarding the leasing of public facilities, we conclude that these University rules and policies, standing alone, are simply too general to supply the required nexus to the pat-down searches. In this regard, it is noteworthy that both the federal regulations analyzed by the Sixth Circuit in *Wagner* and the lease considered by the Eleventh Circuit in *NBC* contained similarly general language conferring broad responsibility on the government entity. *See Wagner,* 772 F.2d at 230 (noting that, pursuant to federal regulations, the Metropolitan Nashville Airport Authority "was responsible for overall base security operations"); *NBC,* 860 F.2d at 1024 (quoting section of lease under which the City of Miami Beach, as lessor, reserved the right "to control or supervise radio, movie and/or television broadcasting or recording and transcription rights and equipment"). In spite of this general language in the federal regulations in *Wagner* and in the lease of a public facility in *NBC,* both courts focused their analysis on whether the particular conduct at issue resulted from a government policy or decision. Following *Wagner* and *NBC,* we conclude that the language in the Huntsman Center's operations manual and in the Director's job description is not dispositive.

To be sure, if the appellants could demonstrate that the pat-down searches directly resulted from the University's policies then the required nexus would be established. However, evidence of such a specific causal connection is lacking. In particular, it is uncontroverted that the challenged searches were conducted pursuant to a policy formulated by Contemporary Services. There is no evidence in the record indicating that the University's rules and policies influenced the formulation or execution of this policy. Indeed, there is nothing in the record that suggests that if United Concerts and Mr. Young had decided to hold the concert at a privately owned facility in which the University's policies and procedures did not apply the pat-down searches would have been conducted any differently than they were at the Huntsman Center. Therefore, we conclude that the requisite nexus between the University's policies and procedures and the pat-down searches is absent. *Compare United States v. Henry,* 615 F.2d 1223, 1228 (9th Cir.1980) (concluding that airport search was part of a national security program specifically required by federal regulations); *United States v. Davis,* 482 F.2d 893, 904 (9th Cir. 1973) (same).

The remaining factors advanced by the appellants are similarly insufficient. As to Mr. James's involvement, the record establishes only that sometime prior to the concert he learned that Contemporary Services would conduct the pat-down searches. Although there is some dispute in the record as to precisely when he learned about the decision to conduct the searches and about whether the University's rules and policies gave him the authority to prevent the searches from occurring, these disputes are not material here. As we have noted, it is well established that a state official's mere approval of or acquiescence to the conduct of a private party is insufficient to establish the nexus required for state action. *See, e.g., San Francisco Arts & Athletics,* 483 U.S. at 547, 107 S.Ct. at 2986–87; *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 164–65, 98 S.Ct. 1729, 1737–38, 56 L.Ed.2d 185 (1978); *Jackson,* 419 U.S. at 357, 95 S.Ct. at 456–57.

Finally, as to the observation of the searches by uniformed officers from the University's Department of Public Safety, we note that a number of courts have held that the mere presence of police officers does not transform the conduct of private parties into state action. *See, e.g., Soldal v. County of Cook,* 942 F.2d 1073, 1075 (7th Cir.1991) (en banc), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992); *Greco v. Guss,* 775 F.2d 161, 168 (7th Cir.1985); *United States v. Coleman,* 628 F.2d 961, 964 (6th Cir.1980); *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507 (5th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980). The fact that the University officers

only observed the pat-down searches distinguishes this case from *D'Amario,* where the employees of a government entity actually enforced the challenged rules barring photographic equipment from the Providence Civic Center. Here, because Contemporary Services employees conducted the pat-down searches pursuant to Contemporary Services policies, the observation of these searches by University officers does not supply the required nexus.

Accordingly, because the factors identified by the appellants do not establish a sufficiently close nexus between the University and the pat-down searches at the Huntsman Center, we hold that the nexus test for state action is not satisfied.

### B. Symbiotic Relationship

■ State action is also present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." *Burton,* 365 U.S. at 725, 81 S.Ct. at 862. The test is based on the *Burton* Court's analysis, but it was christened in *Moose Lodge,* when the Court referred to "the symbiotic relationship between lessor and lessee that was present in *Burton.*" 407 U.S. at 175, 92 S.Ct. at 1972.

In *Burton,* the Court held that a privately owned restaurant's refusal to serve an African–American customer constituted state action because the restaurant leased space from a parking garage owned by a state agency. The Court reasoned that the state's leasing of space to the restaurant conferred a variety of mutual benefits on each party. The restaurant obtained tax benefits and convenient parking for its customers. Public funds were used for building maintenance. In turn, the restaurant was "a physically and financially integral and, indeed, indispensable part of the State's plan to operate its project as a self-sustaining unit." *Burton,* 365 U.S. at 723–24, 81 S.Ct. at 861. Significantly, because the restaurant claimed that serving African–Americans would injure its business, the *Burton* Court found that "profits earned by discrimination not only contribute[d] to, but also [were] indispensable elements in, the financial success of a governmental agency."

*Id.* at 724, 81 S.Ct. at 861. However, the Court was careful to emphasize that its finding of state action was not dispositive as to every. lease of government property. *Id.*

■ Subsequent Supreme Court decisions have read *Burton* narrowly. *See generally* 1 Schwartz & Kirklin, *supra,* § 5.11, at 274 ("The present Supreme Court ... has not found state action in any case that has relied upon *Burton.* In each case in which the applicability of *Burton* has arisen, the Court has distinguished *Burton* on its facts as part of its justification for not finding state action."). The Court has held that extensive state regulation, the receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the government and a private entity that is required for state action. *See, e.g., San Francisco Arts & Athletics,* 483 U.S. at 547 n. 29, 107 S.Ct. at 2987 n. 29 (no symbiotic relationship between the federal government and the United States Olympic Committee even though the government gave the Committee the exclusive right to use the word "Olympic"); *Blum,* 457 U.S. at 1011–12, 1027, 102 S.Ct. at 2789–90, 2797–98 (state licensing of nursing homes, subsidization of capital and operating costs, and payment of medical expenses of ninety percent of patients do not establish symbiotic relationship); *Rendell–Baker,* 457 U.S. at 842, 846, 102 S.Ct. at 2771–72, 2774 (private school receiving ninety percent of its operating budget from public funds not in symbiotic relationship with the state); *Jackson,* 419 U.S. at 358, 95 S.Ct. at 457 (no symbiotic relationship between utility company and state even though company was heavily regulated and enjoyed a partial monopoly and the state approved a tariff setting forth challenged method of terminating service). Post–*Burton* decisions have emphasized the *Burton* Court's finding that the restaurant was an indispensable part of a state project and that the state profited from the restaurant's discrimination. *See, e.g., Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2772; *Vincent v. Trend W. Technical Corp.,* 828 F.2d 563, 569 (9th Cir.1987); *Frazier v. Board of Trustees,* 765 F.2d 1278, 1287–88 (5th Cir.), *modified,*

777 F.2d 329 (5th Cir.1985), *cert. denied,* 476 U.S. 1142, 106 S.Ct. 2252, 90 L.Ed.2d 697 (1986).

In *Milo v. Cushing Mun. Hosp.,* 861 F.2d 1194 (10th Cir.1988), we applied *Burton* to find that the suspension of the staff privileges of two physicians at a municipally owned hospital constituted state action. In addition to the hospital, the plaintiff physicians named as defendants a private corporation that had entered into an agreement to manage the hospital, as well as various officials of both the hospital and the corporation. In determining whether these defendants were state actors, we noted that the city had established a public trust to oversee the hospital and that the public trust had then entered into an operating agreement with the private corporation. The governing board of the hospital trust consisted of three city commissioners and two officials from the private corporation. *Id.* at 1196. A bond indenture governed the manner in which the private corporation could use revenues generated from operation of the hospital. *Id.* Citing *Burton,* we found the state action necessary to support the physicians' claims.

The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity. Questions as to how far the state has insinuated itself into the operations of a particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree. Nevertheless, in this case, we find no symbiotic relationship between United Concerts, Contemporary Services, and the University of Utah.

In arguing that such a relationship existed, the appellants focus on two factors: (1) the fact that challenged searches occurred on University property; and (2) the fact that the University profited from Mr. Young's concert. Appellants maintain that our decision in *Milo* and the Fifth Circuit's decision in *Jatoi v. Hurst–Euless–Bedford Hosp. Auth.,* 807 F.2d 1214 (5th Cir.), *opinion modified on denial of rehearing,* 819 F.2d 545 (5th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988), demonstrate that the required symbiotic relationship is present here.

As we have noted in our discussion of the nexus test, the first factor is clearly not sufficient. The fact that certain conduct occurs on public property does not establish state action. *See, e.g., Wagner,* 772 F.2d at 229 ("Contemporary decisions stress the necessity of a close nexus between the state and the challenged conduct rather than application of a mechanistic formula based on business relationships such as the mere leasing of space by the state."); *NBC,* 860 F.2d at 1027–28. Moreover, in the decisions on which the appellants rely, the finding of a symbiotic relationship between a government body and a private lessee was based on a number of factors not present here. In particular, in *Milo* several officials from the private management company sat on the board of the public trust that was responsible for overseeing the municipal hospital's operations. *Milo,* 861 F.2d at 1196. The private company and the municipal hospital were thus functionally intertwined in a way in which the University, United Concerts, and Contemporary Services were not. Similarly, in *Jatoi,* in finding a symbiotic relationship between a government hospital authority and a private corporation, the Fifth Circuit found that the government entity depended upon the private management company's successful operation of the hospital to repay its bonds and mortgages. *Jatoi,* 807 F.2d at 1221. Such long-term dependence on the operations of a private entity is absent here.

As to the University's profits from the concert, appellants note that the income earned from Mr. Young's concert constituted approximately five percent of the total income generated by the Huntsman Center during the 1991 fiscal year. They also observe that, excluding income from concession sales, novelty sales, and parking, approximately nineteen percent of the Huntsman Center's total income for 1991 came from concerts promoted by guest sponsors such as United Concerts. According to appellants, the University also obtained several noneconomic benefits as a direct result of the patdown searches. They maintain that the searches enhanced the University's ability

"to draw the public to concerts and to seal contracts with popular performers." Aplt. Brief in Chief at 35. The appellants also claim that searches assisted University officials in enforcing the University policies prohibiting alcohol, drugs, and video and tape recorders from the Huntsman Center.

■ Appellants read *Burton* and its progeny too broadly. Here, in contrast to *Burton,* the record does not establish that the allegedly unconstitutional conduct generated profits that were indispensable elements in the University's financial success. The economic benefits that the University derived from leasing the Huntsman Center are indistinguishable from those that could be obtained through contracts generally. *See Rendell–Baker,* 457 U.S. at 843, 102 S.Ct. at 2772–73 (concluding that no symbiotic relationship existed where "the school's fiscal relationship with the State [was] not different from that of many contractors performing services for the government"); *Vincent* 828 F.2d at 569 (9th Cir.1987) (noting that although private firm "may have been dependent economically on its contract with the Air Force," the contract in question "was most certainly not an indispensable element in the Air Force's financial success"). Payments under government contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity. *See Rendell–Baker,* 457 U.S. at 830, 102 S.Ct. at 2765–66; *New York City Jaycees, Inc. v. United States Jaycees, Inc.,* 512 F.2d 856, 859 (2d Cir.1975); *Browns v. Mitchell,* 409 F.2d 593, 595–96 (10th Cir. 1969). Therefore, as to the profits that the University received from the Neil Young concert, the element of indispensability is clearly lacking.

The noneconomic benefits alleged by appellants are similarly insufficient to establish the. requisite symbiotic relationship. The fact that the policies of both United Concerts and the University policies prohibited many of the same items (including drugs and recording equipment) does not mean that the two entities were functionally intertwined under the *Burton* standard. In certain instances, the pat-down searches performed by Contemporary Services employees may have revealed items prohibited by University policies, thereby assisting in their enforcement. However, this assistance falls far short of the degree of indispensability required by *Burton* and, again, is indistinguishable from a variety of benefits that government entities generally derive from public contracts. *See Rendell–Baker,* 457 U.S. at 843, 102 S.Ct. at 2772–73.

In summary, although the University derived benefits from leasing the Huntsman Center to United Concerts and, in some instances, may have obtained assistance in the enforcement of its policies from pat-down searches of some concert patrons, these benefits are insufficient to establish a symbiotic relationship between the University, United Concerts, and Contemporary Services. Accordingly, the symbiotic relationship test for state action has not been satisfied.

### C. Joint Action

■ State action is also present if a private party is a "willful participant in joint action with the State or its agents." *Dennis v. Sparks,* 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *see also Adickes,* 398 U.S. at 152, 90 S.Ct. at 1605. Unlike the symbiotic relationship inquiry undertaken in *Burton* and its progeny, the focus of this test is not on long-term interdependence between the state and a private entity. Instead, courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights. *See, e.g., Collins v. Womancare,* 878 F.2d 1145, 1154 (9th Cir.1989), *cert. denied,* 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990); *Sims v. Jefferson Downs Racing Ass'n,* 778 F.2d 1068, 1076–80 (5th Cir.1985). Just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient. *See Flagg Bros.,* 436 U.S. at 164, 98 S.Ct. at 1737–38 ("This Court ... has never held that a State's mere acquiescence in a private action converts that action into that of the State."); *McKeesport Hosp. v. Accreditation Council for Graduate Medical Educ.,* 24 F.3d 519, 524 (3d Cir.1994).

In applying this test, some courts have adopted the requirements for establishing a conspiracy under Section 1983. These courts conclude that "[a] requirement of the joint action charge ... is that both public and private actors share a common, unconstitutional goal." *Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107 (9th Cir.1991). Under this conspiracy approach, state action may be found if a state actor has participated in or influenced the challenged decision or action. *See, e.g., Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 281–84 (7th Cir.1986) (reversing grant of summary judgment to members of hospital management committee in light of testimony that state official participated in allegedly unconstitutional employment decision); *Wagenmann v. Adams*, 829 F.2d 196, 209–11 (1st Cir.1987) (affirming finding that private citizen was a state actor because of evidence that he exerted influence over police investigation).

Other courts applying the joint action test have focused on the manner in which the alleged constitutional deprivation is effected. These decisions hold that, if there is a "substantial degree of cooperative action" between state and private officials, *Collins*, 878 F.2d at 1154, or if there is "overt and significant state participation," *Hoai v. Vo*, 935 F.2d 308, 313 (D.C.Cir.1991), *cert. denied*, 503 U.S. 967, 112 S.Ct. 1578, 118 L.Ed.2d 220 (1992), in carrying out the deprivation of the plaintiff's constitutional rights, state action is present. Courts have found such cooperative action and overt participation in a variety of circumstances. *See, e.g., Howerton v. Gabica*, 708 F.2d 380, 385 (9th Cir.1983) (finding state action based on police intervention at "every step" of eviction); *Jackson v. Pantazes*, 810 F.2d 426, 429 (4th Cir.1987) (finding bail bondsman to be a state actor because he obtained "significant aid" from a police officer in the arrest of the plaintiff); *Murray v. Wal–Mart, Inc.*, 874 F.2d 555, 559 (8th Cir.1989) (finding state action when police officer relied on store manager's investigation in making arrest instead of conducting independent investigation); *Sims*, 778 F.2d at 1079 (finding state action when state racing officials issued order denying privileges in response to request of private party).

However, some state involvement is too minimal to establish that a private actor and a state official have jointly participated in a deprivation of constitutional rights. *See, e.g., Cobb v. Saturn Land Co.*, 966 F.2d 1334, 1337 (10th Cir.1992) (holding that filing of a lien statement by a court clerk is a ministerial act and does not constitute overt, significant assistance in a private party's allegedly unconstitutional seizure of property).

We have applied the joint action test in several cases involving allegations that private citizens acted in concert with police officers in making arrests. In both *Carey v. Continental Airlines Inc.*, 823 F.2d 1402 (10th Cir.1987), and *Lee v. Town of Estes Park*, 820 F.2d 1112 (10th Cir.1987), we held that citizens who made complaints to police officers that resulted in arrests were not state actors. We found nothing in the record in either case from which we could infer that the allegedly unconstitutional arrests "resulted from any concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." *Carey*, 823 F.2d at 1404. In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest. In contrast, in *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1429 (10th Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985), we concluded that a store security guard who reported a suspected shoplifter to the police was a state actor. We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard.

In *Coleman v. Turpen*, 697 F.2d 1341 (10th Cir.1982) (per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was carried out. There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it. We found the company to be a state actor because it had "jointly participated in seizing

the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation." *Id.* at 1345.

In the instant case, the appellants contend that several factors indicate that United Concerts and Contemporary Services acted in concert with University officials in conducting the pat-down searches such that they should be considered state actors under the joint action test. First, appellants focus on the University policies and regulations that gave Mr. James, as director of the Huntsman Center, broad authority over security for the facility. Second, appellants maintain that the University, United Concerts, and Contemporary Services shared a common aim: "to produce a musical concert from which each would benefit financially." Aplt. Brief in Chief at 40.

Neither of these factors supports a finding of state action under the joint action test. As we have noted in discussing the requirements of the nexus test, the University's policies regarding the Huntsman Center established general obligations to provide security and various support services at events but were silent as to the kind of security provided by lessees such as United Concerts. This silence establishes no more than the University's acquiescence in the practices of the parties that leased the Huntsman Center and is insufficient to establish state action under the joint action test. *See Flagg Bros.,* 436 U.S. at 157, 98 S.Ct. at 1733–34; *Jackson,* 419 U.S. at 352, 95 S.Ct. at 454; *McKeesport,* 24 F.3d at 524.

Similarly, the fact that the University, United Concerts, and Contemporary Services arguably shared the common goal of producing a profitable music concert does not establish the necessary degree of concerted action. Under this approach, state and private entities must share a specific goal to violate the plaintiff's constitutional rights by engaging in a particular course of action. *See Cunningham,* 924 F.2d at 108. The record here contains no evidence from which a jury could reasonably conclude that the University shared with United Concerts and Contemporary Services the common goal of performing pat-down searches on concert pa-

trons. As noted, the searches were conducted pursuant to a policy adopted by Contemporary Services and approved for the Neil Young concert by United Concerts. There is no indication in the record that the decision to follow this policy of conducting pat-down searches was influenced in any way by Mr. James or any other University official. Appellants have also failed to identify any evidence in the record that suggests that University officials played any role in United Concerts' decision to hire Contemporary Services to provide security for the concert.

Moreover, just as under the nexus test, the fact that officers from the University's Department of Public Safety observed the searches is not sufficient to establish state action. "[T]he mere presence of police at the scene of a private act ... *in which they do not participate* does not transform the private act into a public one." *Soldal,* 942 F.2d at 1075. *Accord Greco,* 775 F.2d at 168. Generally, in instances in which courts have found state action based on concerted action between police officers and private parties, the police have substantially assisted in the allegedly wrongful conduct. *See, e.g., Pantazes,* 810 F.2d at 429; *Howerton,* 708 F.2d at 385. Here, there is no indication that the officers from the University Department of Public Safety provided assistance to the Contemporary Services employees conducting the pat-down searches outside the Huntsman Center.

The appellants' reliance on *Jones v. Gutschenritter,* 909 F.2d 1208 (8th Cir.1990) is unavailing. There, the Eighth Circuit reversed a district court's directed verdict in favor of a utility company employee and a police officer, finding sufficient evidence of joint action to warrant consideration of the plaintiff's constitutional claims by a jury. In *Jones,* the plaintiff presented evidence that, at the specific request of the utility company employee, a police officer accompanied him to the plaintiff's apartment to disconnect the plaintiff's electricity. The plaintiff also testified that he did not attempt to interfere because he was fearful of the police officer. In contrast, in this case the appellants have identified no evidence indicating that the presence of University officers influenced

their responses to the pat-down searches. In addition, unlike the utility company official in *Jones,* there is no indication that United Concerts or Contemporary Services employees requested the University officers to observe the searches. Thus, *Jones* does not establish that the pat-down searches constituted state action under the joint action test.

Accordingly, because there is no evidence in the record from which a jury could reasonably conclude that University officials jointly participated in the pat-down searches at the Huntsman Center, we hold that the joint action test is not satisfied. *See Moore v. City of Paducah,* 890 F.2d 831, 835 (6th Cir.1989) (affirming grant of summary judgment because of insufficient evidence to establish joint action between state and private entity); *Gramenos v. Jewel Cos.,* 797 F.2d 432, 435 (7th Cir.1986) (same), *cert. denied,* 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987); *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1349 (7th Cir.1985) (same).[3]

### D. Public Function

■ If the state delegates to a private party a function "traditionally exclusively reserved to the State," *Jackson,* 419 U.S. at 352, 95 S.Ct. at 454, then the private party is necessarily a state actor. *See Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111

S.Ct. 2077, 2085–87, 114 L.Ed.2d 660 (1991); *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2771–72; *Blum,* 457 U.S. at 1011, 102 S.Ct. at 2789; *Flagg Bros.,* 436 U.S. at 155, 98 S.Ct. at 1732–33. This test is difficult to satisfy. "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Bros.,* 436 U.S. at 158, 98 S.Ct. at 1734 (quoting *Jackson,* 419 U.S. at 356, 95 S.Ct. at 456).

Nevertheless, the Supreme Court has found some functions to satisfy this test. These traditional state functions include administering elections of public officials, *Terry v. Adams,* 345 U.S. 461, 468–70, 73 S.Ct. 809, 812–14, 97 L.Ed. 1152 (1953); the operation of a company-owned town, *Marsh v. Alabama,* 326 U.S. 501, 505–09, 66 S.Ct. 276, 278–80, 90 L.Ed. 265 (1946); and the management of a city park, *Evans v. Newton,* 382 U.S. 296, 298–302, 86 S.Ct. 486, 487–90, 15 L.Ed.2d 373 (1966). However, the Court has also declined to find an exclusive state function in a wide variety of circumstances. *See, e.g., Blum,* 457 U.S. at 1011–12, 102 S.Ct. at 2789–90 (nursing home care); *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2771–72 (education of children); *Flagg Bros.,* 436 U.S. at 161–64, 98 S.Ct. at 1735–38 (enforcement of statutory lien by a private warehouse).

Here, the appellants maintain that University officials had the same kind of nondelegable duty to provide security at the Huntsman Center. Appellants read *West* too broadly. Unlike the physician in *West,* the Contemporary Services employees who conducted the pat-down searches at the Huntsman Center were not carrying out an affirmative constitutional obligation of the state. The enforcement of a policy established by a private security firm and subject to the approval of a private concert promoter is clearly distinguishable from the provision of constitutionally required medical care to individuals incarcerated by the state. *See generally* 1 Schwartz & Kirklin, *supra,* § 5.6, at 262 (concluding that the holding of *West* is based upon "a unique coalescing of factors, namely, (1) the provision of services, pursuant to state contract, which the state is constitutionally obligated to provide, (2) in a state facility, (3) to individuals having no other access to those services, and (4) under the heavy influence of state authority").

---

3. Appellants also argue that the Supreme Court's decision in *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), establishes that the joint action test for state action is satisfied here. For several reasons, we disagree.

In *West,* the Supreme Court concluded that a physician under contract to provide medical services to inmates at a state prison was a state actor. The Court did not expressly undertake any of the four state action inquiries that we have outlined, but instead concluded that the physician was "'clothed with the authority of state law,'" *id.* at 55, 108 S.Ct. at 2258 (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)), and that he was "'a person who may fairly be said to be a state actor,'" *id.* 487 U.S. at 55, 108 S.Ct. at 2258 (quoting *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2754). The Court reasoned that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *Id.* 487 U.S. at 56, 108 S.Ct. at 2259.

Here, the appellants contend that, by safeguarding public property, United Concerts and Contemporary Services performed a public function such that they should be considered state actors. For several reasons, we disagree. Most importantly, appellants' characterization of the function performed by United Concerts and Contemporary Services is too broad. Planning the searches independently and conducting them without the assistance of University officials, these two private firms acted pursuant to their own policies. Thus, the function here at issue may be more accurately described as providing security for a company that leases a government-owned facility for an evening.

We have unearthed no decision that specifically addresses the proper characterization of providing security at a building leased from a government entity. However, courts considering private entities performing analogous tasks have refused to find a traditionally exclusive public function. For example, in *NBC*, the Eleventh Circuit concluded that a union leasing a municipally owned facility was not a state actor under the public function test when it excluded a broadcasting company from one of its meetings. The Eleventh Circuit reasoned that "[s]electing media stations to cover a speech has never been an exclusive function of the government, nor has constructing and renting space in which to conduct meetings." 860 F.2d at 1026. Similarly, "The courts have consistently held that the mere fact that an individual's job involves the investigation of crime does not transform him into a government actor." *United States v. Garlock*, 19 F.3d 441, 443–44

(8th Cir.1994); *see also State v. Buswell,* 460 N.W.2d 614, 620 (Minn.1990) (race track security officer not state actor), *cert. denied,* 499 U.S. 906, 111 S.Ct. 1107, 113 L.Ed.2d 216 (1991); *United States v. Lima,* 424 A.2d 113, 118–19 (D.C.App.1980) (store detective not a state actor). "This is true even when the government requires that certain security measures be taken." *Garlock,* 19 F.3d at 444; *see also White v. Scrivner, Corp.,* 594 F.2d 140, 142–43 (5th Cir.1979) (detaining suspected shoplifter is not an exclusive state function).

Our cases involving citizens' arrests also militate against finding an exclusive state function here. In both *Carey* and *Lee* we found that a citizen making such an arrest was not a state actor. Although we did not apply the public function analysis directly, our conclusion that private citizens making arrests were not state actors because they did not act in concert with state officials suggests that the mere performance of security functions such as those here at issue is not traditionally an exclusive function of the state.[4]

We therefore conclude that conducting the pat-down searches did not constitute a traditionally exclusive state function, and that, as a result, the public function test for state action is not satisfied.

## III. CONCLUSION

The pat-down searches conducted at the Huntsman Center on March 20, 1991 cannot be fairly attributed to the State of Utah

---

4. In support of their contention that conducting the pat-down searches constituted a traditional state function, the appellants also rely on *Citizens to End Animal Suffering & Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.,* 745 F.Supp. 65, 70–72 (D.Mass.1990). There, the court held that security guards employed by a private corporation performed a traditional state function by arresting citizens who distributed leaflets on public walkways. The arrests occurred on property that the private corporation had leased from the City of Boston, and the walkways were encumbered by an easement for public access. In finding that the security officers were state actors, the *Faneuil Hall* court noted that the public walkways were "similar to public streets, the regulation of which is a 'public function.'" *Id.* at 71. The court reasoned that "[b]y prohibiting

protesters from assembling in the lanes, the Marketplace is deciding who can use the public easement and under what circumstances they can use it. Rather than acting as a private contractor, therefore, the function performed by the Marketplace is more akin to that of a policeman." *Id.* at 71–72.

*Faneuil Hall* is distinguishable. In contrast to the Faneuil Hall Marketplace, there is no indication in the record here that on the evening of March 20, 1991, the Huntsman Center was encumbered by a public easement. Unlike the function performed by the security guards in *Faneuil Hall*, the actions of Contemporary Service employees in carrying out a privately formulated policy pursuant to a contract with a private concert promoter cannot be equated with those performed by a policeman.

under any of the tests for state action. Accordingly, we AFFIRM the district court's grant of summary judgment in favor of Mr. James, United Concerts, and Contemporary Services.