John DOE I, et al., Plaintiffs,

v.

UNOCAL CORP.; Union Oil Company of California; John Imle; and Roger Beach, Defendants.

John Roe III, et al., Plaintiffs,

v.

Unocal Corporation and Union Oil Company of California, Defendants.

Nos. CV 96–6959 RSWL (BQRx), CV 96–6112 RSWL (BQRx).

United States District Court, C.D. California.

Aug. 31, 2000.

Paul Hoffman, Schonbrun, De Simone, Seplow, Harris & Hoffman, LLP, Venice, CA, Dan Stormer, Anne Richardson, Hadsell & Stormer, Inc., Pasadena, CA, Judith Brown Chomsky, Elkins Park, PA, Jennifer M. Green, Center for Constitutional Rights, New York City, Julie Shapiro, Tacoma, WA, Rick Herz, Katharine J. Redford, Earthrights International, Washington, DC, Terry Collingsworth, Natacha Thys, David Grunwald, International Labor Rights Fund, Washington, DC, Christopher Krafchak, Krafchak & Associates, Los Angeles, CA, Joseph C. Kohn, Martin J. D'urso, Kohn, Swift & Graf, P.C., Philadelphia, PA, Cristobal Bonifaz, John C. Bonifaz, Law Offices of Cristobal Bonifaz, Amherst, MA, for plaintiffs.

Richard E. Drooyan, Daniel P. Collins, Douglas A. Axel, Munger, Tolles & Olson LLP, Los Angeles, CA, Kristin Linsley Myles, Munger, Tolles & Olson LLP, San Francisco, CA, Edwin V. Woodsome, Jr., D. Barclay Edmundson, Howrey & Simon, Los Angeles, CA, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LEW, District Judge.

### I. *Introduction*

Pending in this Court are two related actions filed by fifteen villagers from the Tenasserim region of Burma. The remaining defendants in the first action, *Roe, et al. v. Unocal Corp., et al.*, No. CV 96–6112 RSWL (BQRx), are Unocal Corporation and Union Oil Company of California ("Union Oil"). The remaining defendants in the second action, *Doe, et al. v. Unocal Corp., et al.*, No. CV 96–6959 RSWL (BQRx), are Unocal Corporation, Union Oil, and two Unocal executives, John Imle and Roger Beach. The defendants in both actions are collectively referred to as "Unocal."

Plaintiffs allege that Unocal entered into a joint venture with Total S.A. ("Total"), a French oil company, and the Myanmar government, to extract natural gas from oil fields off the coast of Burma and to transport the gas to the Thai border via a gas

pipeline. Plaintiffs further allege that Unocal is liable for international human rights violations perpetrated by the Burmese military in furtherance and for the benefit of the pipeline portion of the joint venture project.

Before the Court are four consolidated motions for summary judgment filed by Unocal: (1) Motion for Summary Judgment on Plaintiffs' Forced Labor Claims ("Forced Labor Motion"); (2) Motion for Summary Judgment on Plaintiffs' Physical Violence Claims ("Physical Violence Motion"); (3) Motion for Summary Judgment on Plaintiffs' Relocation Claims ("Forced Relocation Motion"); and (4) Motion for Summary Judgment on All of Plaintiffs' Claims ("MGTC Motion"). Unocal's basic argument in the MGTC Motion is that under the terms of various agreements entered into by and between Unocal, Total, and the Myanmar government, the Moattama Gas Transportation Company ("MGTC"), a limited liability corporation, was the entity charged with the construction and operation of the gas pipeline. Therefore, liability in connection with the pipeline lies with that corporate entity and not Unocal. Because the issues addressed in the four motions are inextricably interrelated, the Court will not address the merits of each individual motion, but will consider them as one motion for summary judgment on all of Plaintiffs' claims. The matter came for hearing on July 10, 2000 at which time the Court heard oral argument and took the matter under submission. After reviewing all papers filed in support of and in opposition to the Motion, the admissible evidence, and the arguments of counsel, the Court hereby **GRANTS** Unocal's Motion for Summary Judgment as to Plaintiffs' federal claims and declines to exercise supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367(c).

## II. *Background*

The Court considered all admissible evidence submitted by both parties. However, because it is neither practical nor necessary to summarize all of the evidence, the Court presents only those facts necessary to support its conclusions.

Burma's elected government was overthrown by a military government in 1958. In 1988, Burma's military government suppressed massive pro-democracy demonstrations by jailing and killing thousands of protesters and imposing martial law. At that time, a new military government took control naming itself the State Law and Order Restoration Council ("SLORC") and renaming the country Myanmar.[1] In May 1990, SLORC held multi-party elections in which the National League for Democracy, the leading opposition party, won 80 percent of the parliamentary seats. After the elections, SLORC refused to relinquish power and jailed many political leaders.

The international community has closely scrutinized the SLORC's human rights record since it seized power in 1988. Foreign governments, international organizations, and human rights groups have criticized SLORC for committing such human rights abuses as torture, abuse of women, summary and arbitrary executions, forced labor, forced relocation, and arbitrary arrests and detentions.

In 1982, large natural gas deposits that were to become known as the Yadana field were discovered in the Andaman Sea off the coast of Burma. Sometime in the late 1980s and early 1990s, Unocal conducted an oil and gas exploration in central Burma, and in or about 1991, several international oil companies, including Unocal, began negotiating with SLORC regarding oil and gas exploration in Burma. In May 1992, Control Risk Group, a consulting company hired by Unocal to assess the

---

1. The United States Government continues to refer to the country as Burma. Subsequent to the events relevant to this litigation, Burma's ruling military government changed its name from the State Law and Order Restoration Committee to the State Peace and Development Council.

risks involved in foreign investment, issued a report informing Unocal of Burma's economic and political climate. The report states:

> Throughout Burma the government habitually makes use of forced labour to construct roads. In Karen and Mon states the army is forcing villagers to move to more secure sites (similar to the 'strategic hamlets' employed by the U.S. army in Vietnam) in the hope of cutting off their links with the guerrillas. There are credible reports of military attacks on civilians in the regions. In such circumstances UNOCAL and its partners will have little freedom of manoeuvre. The local community is already terrorized: it will regard outsiders apparently backed by the army with extreme suspicion.

(Richardson Decl., Ex. 476 at 33575.)

In 1992, the Myanmar government established a state-owned company, the Myanma Oil and Gas Enterprise ("MOGE"), to hold the government's interest in its energy products and to produce and sell nation's oil and gas resources. MOGE then auctioned off a license to produce, transport, and sell the natural gas discovered in the Andaman Sea. Despite Control Risk Group's report, Unocal bid on the contract but lost to the French oil company, Total. Total set up a subsidiary, Total Myanmar Exploration and Production ("TMEP"), to receive Total's interest in the contract, and on July 9, 1992, TMEP and MOGE formed the Moattama Gas Project [2] (the "Project") by entering into two agreements: the Production Sharing Contract (the "PSC") and the Memorandum of Understanding (the "MOU," collectively the "Agreements").

The Agreements set forth the rights and obligations of the parties and established TMEP as the Operator and Contractor of the Project. The Agreements further provided that "MOGE shall assist and expedite Contractor's execution of the Work Programme by providing . . . security protection and rights of way and easements as may be requested by Contractor." MOGE was not initially an equity participant in the Project, but did retain an option to acquire a 15 percent interest in the Project. Before exercising the option, MOGE was entitled to bonuses and royalties determined by the amount of gas produced and sold. The Agreements also provided a Thai government entity, Petroleum Authority of Thailand Exploration and Production ("PTTEP"), with an option to acquire a 30 percent interest in the Project.

The Project was structured in three phases. During the first phase, TMEP was to appraise the gas discovery and determine its commerciality. If, and only if, TMEP made a "Commercial Discovery," the second phase would commence. The Agreements set forth a number of conditions that had to be satisfied before TMEP could declare a Commercial Discovery. These conditions included the discovery of a specified amount of gas, a commitment by the Thai government to purchase a specified amount of gas, and a revenue projection that would provide a 15 percent rate of return on the Project. The second phase consisted of the development of the natural gas fields and the construction of a pipeline to be used to transport the gas. The third phase involved the transportation of gas. The Agreements also provided that the Project would consist of two entities. The first entity, referred to as the Joint Venture, was responsible for the production of gas. The second entity, referred to as the Gas Transportation Company, was charged with constructing and operating the gas pipeline.

The pipeline was to run eastbound through Burma's Tenasserim region, a rural area in the southern portion of Burma that is home to "rebels" who disfavor the SLORC. Accordingly, the Myanmar military increased its presence in the pipeline region to provide security for the Project. In addition, the military prepared for a

---

**2.** Later renamed the Yadana Gas Project or the Yadana Natural Gas Project.

Commercial Discovery by building army barracks and helipads and clearing roads along the proposed pipeline route. Plaintiffs are Tenasserim villagers who allege that the Burmese military committed human rights violations against them in connection with the Project. According to the deposition testimony of Plaintiffs and witnesses, the military forced Plaintiffs and others, under threat of violence, to work on these projects and to serve as porters for the military for days at a time. Plaintiffs further contend that the military forced entire villages to relocate for the benefit of the pipeline project. The deposition testimony recounted numerous acts of violence perpetrated by Burmese soldiers in connection with the forced labor and forced relocations. Plaintiffs allege international law violations including torture, rape, murder, forced labor, and forced relocation, and California state law torts including false imprisonment, assault, intentional infliction of emotional distress, and negligence.[3]

In 1992, Unocal and Total negotiated an assignment of a portion of Total's interest in the Project to Unocal. On November 25, 1992, Unocal made an $8.6 million offer for a 47.5 percent participating interest in Total's rights and interests under the Agreements, which Total accepted in December 1992. Unocal then incorporated Unocal Myanmar Offshore Company ("UMOC") to hold Unocal's interest in the Project and on January 22, 1993, UMOC acquired an undivided 47.5 percent interest in TMEP's rights under the Agreements.

During the negotiations, Unocal and Total discussed the potential problems of having the Myanmar military provide security for the Project. Stephen Lipman, Unocal's Vice President of International Affairs, testified that

in our discussions between Unocal and Total, we said that the option of having the military provide protection for the pipeline construction and operation of it would be they might proceed in the manner that would be out of our control and not be in a manner that we would like to see them proceed, I mean, going to the excess. So we didn't know. It's an unknown, and it's something that we couldn't control. So that was the hazard we were talking about. It was out of our control if that kind of full relinquishment of security was given to the government.

(Lipman Dep. at 297:11–24.)

In March 1994, Unocal and Total officials met to discuss issues concerning the construction of the gas pipeline. One of the subjects of discussion was the threat to the pipeline Project posed by "rebels" residing in the pipeline region and by Burmese refugees residing in Thailand who would, on occasion, return to Burma. A Unocal report issued after the meetings states:

The Myanmar Army claims that, despite these people, they have an area "secured" *only* along the proposed pipeline route and within ± 10 kilometers of the proposed pipeline route.... [T]he Burmese Army claims to have 'many battalions' in the area, based in Kaleinaung, with up to 200 troops in the mountain jungle area near the border along the pipeline route.

(Richardson Decl., Ex. 1010 at 4572 (emphasis in original).)

After UMOC acquired a portion of TMEP's interest in the Project, the parties had to allocate responsibilities between themselves. On June 1, 1994, UMOC and TMEP entered into a Production Operating Agreement ("POA"), the purpose of which was to define the parties' rights and obligations with respect to operations under the PSC. The POA appointed TMEP as the Operator of the venture and provided that TMEP would issue "cash calls" to the participants for their share of expenses. As Operator, TMEP retained the

---

**3.** The violence perpetrated against Plaintiffs is well documented in the deposition testimony filed under seal with the Court and need not be recited in detail in this Order.

responsibility of hiring skilled and un-skilled labor to build the pipeline.

Meanwhile, on six occasions between April 1994 and January 1996, Unocal representatives traveled to Myanmar to conduct firsthand, in-field evaluations of the Project. (Richardson Decl., Ex. 37.) A Unocal report issued after the April 1994 trip summarizes the representatives' observations and impressions after their inspection of various routing options for the proposed pipeline. The report reads, in part:

Total and Unocal will insist upon western style construction practices including fair labor rates and the use of an internationally recognized contractor. I asked specifically if Total would ever agree to allow Myanmar to build a road or some other facilities as a partial contribution to the partnership knowing that they might use impressed labor. Mr. Madeo [of Total] assured us that would be unacceptable to Total.

(Richardson Decl., Ex. 230 at 19016.)

In late 1994, in anticipation of the formal declaration of Commercial Discovery, the parties took steps to set up the gas transportation corporation called for in the Agreements. On November 11, 1994, Unocal formed the Unocal International Pipeline Corporation ("UIPC") for purposes of holding its shares in the pipeline corporation; and on December 20, 1994, the pipeline corporation, Moattama Gas Transportation Company ("MGTC"), was incorporated. MGTC's initial shareholders were TMEP and UIPC. Then on January 24 and 29, 1995, PTTEP (the Thai government entity) exercised its option acquire a 30 percent interest in the Joint Venture and MGTC. On February 8, 1995, TMEP declared a Commercial Discovery and on April 3, 1995, MOGE exercised its right to acquire a 15 percent interest in the Project. Following MOGE's buy in, the respective interests of the participants in the Project were: TMEP 31.2375 percent; UMOC 28.2625 percent; PTTEP 25.5 percent; and MOGE 15.0 percent.

During this same period, Unocal executives were addressing the potential for human rights abuses committed by the Myanmar government in connection with the Project. In a December 1994 letter, Unocal CEO Roger Beach wrote:

I want to state unequivocally that Unocal does not tolerate human rights violations in connection with any of our business activities. It is our policy to only do business in countries where we can operate ethically and responsibly. Myanmar is no exception. We are monitoring human rights issues in Myanmar very closely, both on our own and through continuing dialog with international organizations. Earlier this year, we conducted two fact-finding missions to Myanmar and found absolutely no evidence of human rights violations in connection with our natural gas project.

(Richardson Decl., Ex. 471 at 31895.)

In early 1995, representatives from Unocal met with Human Rights Watch ("HRW"). In this meeting, the HRW representatives told Unocal that HRW was not against investment in foreign countries, even those nations without spotless human rights records. Myanmar, though, was an exception. HRW's director informed Unocal that forced labor was "so pervasive" in the country that HRW cannot condone any investment that would enrich the current regime. (Richardson Decl., Ex. 260 at 16561–2.)

A 1995 letter written by a consultant to Unocal states:

[M]y conclusion is that egregious human rights violations have occurred, and are occurring now, in southern Burma. The most common are forced relocation without compensation of families from land near/along the pipeline route; forced labor to work on infrastructure projects supporting the pipeline (the SLORC calls this government service in lieu of payment of taxes); and imprisonment and/or execution by the army of those opposing such actions. Unocal, by

seeming to have accepted SLORC's version of events, appears at best naive and at worst a willing partner in the situation. (Richardson Decl. Ex. 363 at 17350.)

On January 4, 1995, Unocal president, John Imle, and other Unocal representatives met with a group of human rights watch groups opposed to the pipeline project at Unocal Headquarters in Los Angeles. The following exchange took place between Pamela Wellner of Greenpeace and John Imle:

WELLNER: What is happening in the exact pipeline area is increased forced labor, increased relocation of villagers. And so the situation there is getting much much worse. There might be some improvements in Rangoon but your project is fostering massive human rights violations in the area.

IMLE: Well, I would suggest that if there were fewer threats . . .

WELLNER: It has nothing to do with threats, these are just people who are going about their day to day business.

IMLE: People are threatening physical damage to the pipeline, do you agree with that?

WELLNER: I do agree with that but it has nothing to do with taking people out of their villages and forcing them to work . . .

IMLE: I'm sorry, it has a lot to do with the military presence there and an increasing military presence.

WELLNER: And using people as forced labor has to do with threats? Are you saying that if they didn't threaten to blow up the pipeline or to disrupt it . . .

IMLE: You are taking what I'm saying completely out of context and you understand that. Let's be reasonable about this. What I'm saying is that if you threaten the pipeline there's gonna be more military. If forced labor goes hand and glove with the military yes there will be more forced labor.

For every threat to the pipeline there will be a reaction.

(Richardson Decl., Ex.2005 at 2772–73.)

On March 1 and 2, 1995, Unocal met with Total to discuss the pipeline project, including the pipeline's security. After the meeting, a memorandum was produced which states that "[f]our battalions of 600 men each will protect the corridor. Col. Zaw Tun has a total of 10 battalions under command and is most confident about [the military's] ability to protect the Northern Pipeline route. Fifty soldiers will be assigned to guard each survey team." (Richardson Decl., Ex. 64 at 25679–80.)

On March 8, 1995, Unocal CEO Roger Beach wrote a letter to Unocal Chairman Richard J. Stegemeier "informing [him] of an armed attack on a geotechnical survey team working on the western-most onshore portion of the Yadana pipeline route near the village of Kambauk in southern Myanmar" which left five Myanmar nationals dead, four of whom were "employees working on behalf of the Total/Unocal/PTTEP consortium." (Richardson Decl., Ex. 1063 at 16544.) The letter continues to state that "[w]e plan to complete the Yadana project as expeditiously as possible, once we are assured of adequate security." (Richardson Decl., Ex. 1063 at 16544.)

On March 16, 1995, Joel Robinson of Unocal wrote Unocal President John Imle a letter in which he states that he had received "more of the publications from the 'Karen press' which depicted in more detail than I have seen before the increased encroachment of SLORC activities into the villages of the pipeline area. Our assertion that SLORC has not expanded and amplified its usual methods around the pipeline on our behalf may not withstand much scrutiny." (Richardson Decl., Ex. 158 at 16514.)

A May 10, 1995 Unocal "briefing document" states that "Unocal's observer in Myanmar spent four days in early May visiting 11 villages along the pipeline

route, meeting with over 160 villagers. . . . It is clear that there is strong local support for the project. Local people welcome the jobs, the training, and the benefits to the local economy." (Richardson Decl., Ex. 73 at 13940.) The document then states that "[a]ccording to our contract, the government of Myanmar is responsible for protecting the pipeline. There is military protection for the pipeline and, when we have work to do along the pipeline that requires security, then military people will, as a matter of course, be nearby." (Richardson Decl., Ex. 73 at 13940.) Unocal CEO Roger Beach was asked about this briefing document in his deposition. He testified that "[i]t is my understanding that the Union of Myanmar was going to provide general security in the area of the pipeline, in its capacity as the sovereign government of Myanmar. I have no understanding with regard to whether or not Myanmar had a contractual obligation to provide such security, or whether the security provided by Myanmar was provided pursuant to any contract." (Beach Dep. 129:21.)

A May 1995 United States State Department cable from the U.S. Embassy in Rangoon, Myanmar, states:

> On the general issue of the close working relationship between Total/Unocal and the Burmese Military, Robinson [of Unocal] had no apologies to make. He stated forthrightly that the companies have hired the Burmese military to provide security for the Project and pay for this through the Myanmar Oil and Gas Enterprise (MOGE). He said three truckloads of soldiers accompany Project officials as they conduct survey work and visit villages. He said Total's security officials meet with military counterparts to inform them of the next day's activities so that soldiers can ensure the area is secure and guard the work perimeter while the survey team goes about its business.

(Collingsworth Decl., Ex. A at 23.)

On May 10, 1995, Joel Robinson sent a letter informing Total of his "general thoughts about [his] visit to the pipeline route." (Richardson Decl., Ex. 67 at 21734.) The letter stated that "[f]rom Unocal's standpoint, probably the most sensitive issue is 'what is forced labor' and 'how can you identify it.' I am sure that you will be thinking about the demarcation between work done by the Project and work done 'on behalf of' the Project. Where the responsibility of the Project ends is *very important.*" (Richardson Decl., Ex. 67 at 21734 (emphasis in original).)

In June 1995, Amnesty International sent David Garcia, a Unocal employee, a copy of its 1994 Human Rights report on Burma. Attached was a personal cover note addressed to Mr. Garcia which warns that

> there is a disturbing quote from Thein Oo Po Saw, director of the Scientific and Technology Research Dept. of the Ministry of Industry. His comment could mean that the government plans to use 'voluntary' labor in conjunction with the pipeline. We know that from long experience with this regime that what they call 'voluntary' labor is called forced labor in other parts of the world; and, forced labor not of convicts, but of ordinary citizens. Myanmar forced labor conditions have been documented to be brutal and even deadly.

(Richardson Decl., Ex. 316 at 16350.)

A January 22, 1996 U.S. Embassy cable reported that "Total brings skilled labor from Rangoon, but obtains unskilled labor locally. According to Total briefing materials, the Army hires the local villagers that provide the pipeline Project manual labor. Between February 1995 and mid-January 1996, Total paid 463 villagers 'hired by the army.'" (Collingsworth Decl., Ex. A at 109–111.)

In or about January 1996, Total's Herve Chagnoux was questioned by the press about forced labor utilized in connection with the Project. In a letter written by

Chagnoux to Unocal on February 1, 1996, he acknowledged that his answers to the press' questions were poor. The letter continued:

> By stating that I could not *guarantee* that the army is not using forced labour, I certainly imply that they might, (and they might) but I am saying that we do not have to monitor army's behaviour: we have our responsibilities; they have their responsibilities; and we refuse to be pushed into assuming more than what we can really guarantee. About forced labour used by the troops assigned to provide security on our pipeline project, let us admit between Unocal and Total that we might be in a grey zone.

(Richardson Decl., Ex. 91 at 31738 (emphasis in original).)

In April 1996, Unocal CEO Roger Beach and Unocal President John Imle visited the Project. A report was prepared, apparently for their review, which provides charts representing the amount of money paid by the Project to local "project helpers" by month. (Richardson Decl., Ex. 148 at 16834.) One chart documents the numbers of "villagers" hired by Army Battalions. (Richardson Decl., Ex. 148 at 16835.) Another chart documents money spent on food rations for the army and villagers. (Richardson Decl., Ex. 148 at 16836.)

A U.S. State Department cable summarizes a conversation the U.S. government official had with Unocal's Joel Robinson regarding the Project's relationship to the Myanmar military.

The State Department official noted:

> Robinson acknowledged that army units providing security for the pipeline construction do use civilian porters, and Total/Unocal cannot control their recruitment process. Robinson said Total meets the porters at the marshaling camp, where a Total doctor gives them a physical exam. Some are sent home due to their poor physical condition (the companies accept only males between 18–45 years of age). Robinson said To-

> tal keeps careful records of the porters to ensure they are paid. He said these records of workers and porters showed that they had not been overly drawn from just one village, in fact, the most that had been drawn from a particular village was three.

(Collingsworth Decl., Ex. A at 17.)

Another State Department cable dated May 20, 1996 stated:

> Forced labor is currently being channeled, according to NGO reports, to service roads for the pipeline to Thailand. The mode of operation apparently is to build the service road first, then lay pipe alongside. There are plans for a helicopter pad and airstrip in the area ... in part for use by oil company executives. When foreigners come on daily helicopter trips to inspect work sites, involuntary laborers are forced into the bush outside camera range.

(Collingsworth Decl., Ex. A at 51–52.)

In a September 17, 1996 memorandum from Total to Unocal regarding forced labor, Total acknowledged that "[w]e were told that even if Total is not using forced labour directly, the troops assigned to the protection of our operations use forced labour to build their camps and to carry their equipments. We had to mention that when we had knowledge of such occurrences, the workers have been compensated." (Richardson Decl., Ex. 52 at 29722.) On November 5, 1996, MGTC had a committee meeting in which the members discussed certain "areas of concern." One area of concern listed in the minutes was that of "site security solely relying upon the M.A.F. [Myanmar Armed Forces] to ensure safe access to the pipeline/track construction zone." (Richardson Decl., Ex. 396 at 27893.)

On March 4, 1997, Unocal wrote a letter to the City Counsel of New York in response to a proposed New York City select purchasing law imposed on firms that do business in Burma. This letter reads: "There is a civil war going on, as it has for

50 years. There are consistent reports of human rights violations—many of which are traceable to the war. On the other hand, the war is 150 to 200 miles from the pipeline project, where no such violations have taken place." (Richardson Decl., Ex. 31.) This evidence is offered to demonstrate that the human rights violations occurring near the pipeline related to the pipeline, and not to any war.

### III. *Discussion*

In these two actions, Plaintiffs allege that Unocal is liable for torts committed against them by the Myanmar military for the benefit of the Project. According to Plaintiffs, Unocal, Total, and the Myanmar government formed a joint venture to produce natural gas and transport it via pipeline from the Andaman Sea to the Thai border. The Agreements executed by and between the parties placed responsibility for the security of the pipeline with the Myanmar government. The Myanmar military did provide security as well as other services for the benefit of the Project such as road clearing and the construction of helipads and army barracks.

Plaintiffs filed these related claims in the United States District Court pursuant to the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., and the federal question statute, 28 U.S.C. § 1331. In addition, Plaintiffs allege a number of pendent California state causes of action including wrongful death, false imprisonment, assault, intentional infliction of emotional distress, and negligence pursuant to 28 U.S.C. § 1367. Unocal now moves for summary judgment on all of Plaintiffs' claims.

### A. *Summary Judgment*

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue is one in which the evidence is such that a reasonable factfin-

der could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The evidence, and any inferences based on underlying facts, must be viewed in a light most favorable to the opposing party. *Diaz v. AT & T*, 752 F.2d 1356, 1358 n. 1 (9th Cir.1985).

Where the moving party does not have the burden of proof at trial on a dispositive issue, the moving party may meet its burden for summary judgment by showing an "absence of evidence" to support the non-moving party's case. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). A non-moving party who has the burden of proof at trial must present enough evidence that a "fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

### B. *The Alien Tort Claims Act*

#### 1. *The Act*

The Alien Tort Claims Act ("ATCA") states:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350. The ATCA provides both subject matter jurisdiction and a cause of action. *In re Estate of Ferdinand Marcos, Human Rights Litigation*, 25 F.3d 1467, 1474–75 (9th Cir.1994) ("Estate II"). To state a claim under the ATCA, a plaintiff must allege (1) a claim by an alien, (2) alleging a tort, and (3) a violation of the law of nations (international law). The parties do not dispute that the first two elements are satisfied. The issue is whether the conduct of the Myanmar military violated international law, and if so, whether Unocal is liable for these violations.

■ Actionable violations of international law must be of a norm that is specific, universal, and obligatory. *Id.* at 1475 (citing *Filartiga v. Pena–Irala,* 630 F.2d 876, 881 (2d Cir.1980)); *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 781 (D.C.Cir.1984). When ascertaining the content of the law of nations, the Court must interpret international law not as it was in 1789 (the year the ATCA was enacted), but as it has evolved and exists among the nations of the world today. *Kadic v. Karadzic,* 70 F.3d 232, 238 (2d Cir.1995) (citing *Filartiga,* 630 F.2d at 881). The norms of the law of nations are found by consulting juridical writings on public law, considering the general practice of nations, and referring to judicial decisions recognizing and enforcing international law. *Id.* at 241.

The parties dispute whether only those violations that rise to the level of a *jus cogen* violation are actionable under section 1350. In *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699 (9th Cir.1992), the Ninth Circuit provided an extensive discussion of the distinction between *jus cogen* norms and customary international law. Customary international law rests on the consent of the states. *Id.* at 715. Those states that refuse to agree to a norm of customary international law are not bound by it. *Id.* In contrast, *jus cogens* norms, norms derived from values taken to be fundamental by the international community, enjoy the highest status within customary international law and are binding on all nations. *Id.* While the Ninth Circuit has not expressly held that only *jus cogen* norms are actionable, the Circuit's holding in *Estate II* that actionable violations are only those that are specific, universal, and obligatory is consistent with this interpretation. *Estate II,* 25 F.3d at 1475. It is well accepted that torture, murder, genocide and slavery all constitute violations of *jus cogen* norms. *United States v. Matta–Ballesteros,* 71 F.3d 754, 764 n. 5 (9th Cir.1995) (citing *Siderman de Blake,* 965 F.2d at 717).

## 2. State Action Requirement and Individual Liability

The Second Circuit's decision in *Filartiga* marked the beginning of a new era of reliance on section 1350 in international human rights cases and was the first Circuit decision interpreting the ATCA. "Construing this rarely-invoked provision, [the Court held] that deliberate torture perpetrated under color of official authority violates universally accepted norms of international law of human rights." *Filartiga,* 630 F.2d at 878. This holding left open whether the ATCA applies *only* to state actors or also to non-state actors. Four years later, in *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774 (D.C.Cir.1984), Judge Harry T. Edwards commented that individual liability was available under the ATCA for a handful of acts including piracy and slave trading. *Id.* at 794–95 (Edwards, J., concurring). However, Judge Edwards limited the application of the ATCA to private defendants by "declin[ing] to read section 1350 to cover torture by non-state actors, absent guidance from the Supreme Court on the statute's use of the term 'law of nations.' " *Id.* at 795 (Edwards, J., concurring).

In *In re Estate of Ferdinand E Marcos Human Rights Litigation* ("Estate I"), 978 F.2d 493 (9th Cir.1992), the Ninth Circuit stated without significant analysis that "[o]nly individuals who have acted under official authority or under color of such authority may violate international law...." *Id.* at 501–02. More recently, the Ninth Circuit noted, without comment on its decision in *Estate I,* that it did "not need to reach the issue of whether the law of nations applies to private as opposed to government conduct." *Hamid v. Price Waterhouse,* 51 F.3d 1411, 1417–18 (9th Cir.1995). However, the Second Circuit's decision in *Kadic* provides a reasoned analysis of the scope of the private individual's liability for violations of international law. There, the court disagreed with the proposition "that the law of nations, as

understood in the modern era, confines its reach to state action. Instead, [the court held] that certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." *Kadic,* 70 F.3d at 239. While crimes such as torture and summary execution are proscribed by international law only when committed by state officials or under color of law,[4] *Kadic,* 70 F.3d at 243, the law of nations has historically been applied to private actors for the crimes of piracy and slave trading, and for certain war crimes. *Id.* at 239.

### 3. *Liability as a State Actor*

■ "The 'color of law' jurisprudence of 42 U.S.C. § 1983 is a relevant guide to whether a defendant has engaged in official action for purposes of jurisdiction under the Alien Tort Claims Act." *Id.* at 245. A private individual acts under "color of law" within the meaning of section 1983 when he acts together with state officials or with significant state aid. *Id.* (concluding that plaintiffs were entitled to prove their allegations that a private actor acted under "color of law" by acting in concert with Yugoslav officials or with significant Yugoslav aid).[5]

Both the Ninth Circuit and the Supreme Court have recognized that "cases deciding when private action might be deemed that of the state have not been a model of consistency." *George v. Pacific–CSC Work Furlough,* 91 F.3d 1227, 1230 (9th Cir.1996) (citing *Lebron v. National R.R. Passenger Corp.,* 513 U.S. 374, 377–79, 115 S.Ct. 961, 964, 130 L.Ed.2d 902 (1995)). The Supreme Court has taken a flexible approach to the state action doctrine, *Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1447 (10th Cir.1995), applying four distinct tests to the facts of each case: public function, state compulsion,

nexus, and joint action. *George,* 91 F.3d at 1230. Under each of these four tests, the unlawful conduct must be fairly attributable to the state. *Gallagher,* 49 F.3d at 1447 (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982)).

Plaintiffs argue that Unocal's participation in the Joint Venture constitutes state action under the joint action test. Under the joint action test, state action is present if a private party is a "willful participant in joint action with the State or its agents." *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980). "Courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Gallagher,* 49 F.3d at 1453 (citing *Collins v. Womancare,* 878 F.2d 1145, 1154 (9th Cir. 1989)).

*Collins* involved a suit by abortion protesters against Womancare, a health service provider for women. *Collins,* 878 F.2d at 1146. Womancare had sought and obtained a preliminary injunction prohibiting specific anti-abortion protesters from picketing any closer than across the street from its property. *Id.* After the plaintiffs began picketing on the clinic's side of the street, two Womancare employees attempted to serve the protesters with the injunction and asked them to move across the street. *Id.* When the plaintiffs refused, Deborah Flemming, one of the Womancare employees, called the police. *Id.* The police officer decided to take no action, but advised Flemming of her power to make a citizen's arrest. *Id.* The officer also cautioned Flemming that doing so may subject her to liability for false arrest. *Id.* At that point, Flemming (upon the advice of her attorney) performed a citi-

---

4. However, individual liability may attach for torture or summary execution when perpetrated in the course of genocide or as a war crime. *Kadic,* 70 F.3d at 243.

5. To constitute a state under international law, an entity need only have a defined territory and a permanent population under the control of its own government, with the capacity to engage in formal relations with other states. *Kadic,* 70 F.3d at 245.

zen's arrest and the plaintiffs sued under section 1983, alleging that Flemming had acted under color of law. *Id.*

In presenting the joint action test, the Ninth Circuit stated that one way to prove joint action is to demonstrate a conspiracy between the private and state actors. *Id.* at 1154. The other way is to show that the private party is "a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of [section] 1983 actions." *Id.* The Court held that the plaintiffs' claim failed as a matter of law because the facts did not establish that the state " 'has so far insinuated itself into a position of interdependence with [the clinic's employees] that it must be recognized as a joint participant in the challenged activity.' Instead, virtually all of the circumstances of this case point to the opposite conclusion." *Id.* at 1155 (citations omitted).

In *Gallagher*, a group of concert goers sued the concert's promoter and the security guard provider under section 1983 after being subjected to a pat-down search before entering a Neil Young concert at the University of Utah. *Gallagher*, 49 F.3d at 1444–45. Two weeks before the concert, University officials met with the promoter and the security team to discuss security for the event. *Id.* At this meeting, the promoter directed the security company to perform the type of pat-down searches generally performed by the security company at rock concerts. *Id.* The Tenth Circuit concluded that the joint action test did not apply in this situation because the evidence did not show that University officials jointly participated in the pat-down searches. *Id.* at 1453–56. The Tenth Circuit commented that in applying the joint action test,

> some courts have adopted the requirements for establishing a conspiracy under Section 1983. These courts [require] that both public and private actors share a common, unconstitutional

goal. Under this conspiracy approach, state action may be found if a state actor has participated in or influenced the challenged decision or action.

*Id.* at 1454 (citations omitted). The Tenth Circuit then stated that other courts require a " 'substantial degree of cooperative action' between state and private officials." *Id.* (citing *Collins* 878 F.2d at 1154). "However, some state involvement is too minimal to establish that a private actor and a state official have jointly participated in a deprivation of constitutional rights." *Id.* In applying the test to the facts, the Court held that the University's silence as to the kind of security provided or its acquiescence in the practices of the parties does not establish state action under the joint action test. *Id.* at 1455. Moreover, the fact that the defendants and the University shared the common goal of producing a profitable music concert does not establish the necessary degree of concerted action. *Id.* "Under [the joint action] approach, state and private entities must share a specific goal to violate the plaintiff's constitutional rights by engaging in a particular course of action." *Id.*

Here, Plaintiffs present evidence demonstrating that before joining the Project, Unocal knew that the military had a record of committing human rights abuses; that the Project hired the military to provide security for the Project, a military that forced villagers to work and entire villages to relocate for the benefit of the Project; that the military, while forcing villagers to work and relocate, committed numerous acts of violence; and that Unocal knew or should have known that the military did commit, was committing, and would continue to commit these tortious acts. As in *Gallagher*, Unocal and SLORC shared the goal of a profitable project. However, as the *Gallagher* Court stated, this shared goal does not establish joint action. Plaintiffs present no evidence that Unocal "participated in or influenced" the military's unlawful conduct; nor do Plaintiffs present evidence that Unocal "con-

spired" with the military to commit the challenged conduct.

### 4. *State Action and Proximate Cause*

■ The joint action cases address situations in which a private individual, acting in concert with the government, commits the challenged acts. In this case, the government committed the challenged acts. In order for a private individual to be liable for a section 1983 violation when the state actor commits the challenged conduct, the plaintiff must establish that the private individual was the proximate cause of the violation. *Brower v. Inyo County,* 817 F.2d 540, 547 (9th Cir.1987). *See King v. Massarweh,* 782 F.2d 825, 829 (9th Cir. 1986); *Arnold,* 637 F.2d at 1356. In order to establish proximate cause, a plaintiff must prove that the private individuals exercised *control* over the government official's decision to commit the section 1983 violation. *King,* 782 F.2d at 829.

In *Arnold,* a task force consisting of law enforcement, the district attorney, and IBM's manager of security was formed to investigate leaks of trade secrets from within IBM. *Arnold,* 637 F.2d at 1352. This investigation led to the plaintiff's arrest and indictment, as well as the search of his home. *Id.* at 1353. After the charges against him were dismissed, the plaintiff sued IBM under section 1983 for its involvement in the investigation. *Id.* at 1354. In addition to providing the task force with its security manager, IBM also provided the task force with information, funding, and witnesses to testify before a grand jury. *Id.* at 1357. In determining whether IBM proximately caused the alleged constitutional violations for purposes of section 1983, the Court stated that the plaintiff was required to demonstrate that the "defendants had some control or power over the Task Force, and that defendants directed the Task Force to take action

against [him]." *Id.* at 1356. The Court concluded that because "[t]here is nothing in the record ... to indicate that defendants exerted any control over the decision making of the Task Force," the plaintiff failed to establish proximate cause. *Id.* at 1357.

In *King,* the landlord of an apartment building called the police after a rent dispute with tenants. *King,* 782 F.2d at 826. The officers arrested the tenants and searched their apartment unit after being told by the landlord that the tenants did not belong on the premises. *Id.* The tenants then sued the officers, the city, and the landlord under section 1983. *Id.* The Ninth Circuit, citing *Arnold,* stated that "absent some showing that a private party had some control over state officials' decision [to commit the challenged act], the private party did not proximately cause the injuries stemming from [the act]." *Id.* at 829. The court concluded that the district court's dismissal of the action against the landlord was appropriate because nothing in the record indicated that the landlord exerted any control over the officers' decision to search the apartment or arrest the plaintiffs. *Id.*[6]

In this case, Plaintiffs present no evidence Unocal "controlled" the Myanmar military's decision to the commit the alleged tortious acts. Accordingly, Plaintiffs' claims that Unocal acted under "color of law" for purposes of the ATCA fail as a matter of law.

### 5. *Forced Labor*

■ As discussed above, individual liability under the ATCA may be established for acts rising to the level of slavery or slave trading. *See Kadic,* 70 F.3d at 234; *also Tel–Oren,* 726 F.2d at 794 (Edwards, J., concurring) ("individual liability re-

---

6. Plaintiffs cite *Groom v. Safeway, Inc.,* 973 F.Supp. 987 (W.D.Wash.1997), to establish that Unocal controlled the Myanmar military. The Court finds that *Groom* is distinguishable on its facts because the off-duty police officer's duties were confined to providing security within Safeway's store and on Safeway's behalf. In the instant case, the military was not so confined.

mained available, in the face of the 19th century trend toward statism, for a handful of private acts, including piracy and slave trading"). Plaintiffs contend that forced labor is "modern slavery" and is therefore one of the "handful of crimes" to which individual liability under section 1350 attaches. Unocal, on the other hand, argues that the Myanmar military's use of forced labor is more akin to a public service requirement of limited duration than to slavery.

The International Labor Organization ("ILO") is the agency within the United Nations that has primary responsibility for all matters related to the rights of workers. The ILO sets international labor standards in binding treaties called Conventions. Burma joined the ILO in 1948 and has ratified 21 ILO Conventions, including Forced Labor Convention No. 29. Convention 29 prohibits the use of forced labor and defines forced labor as "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily." ILO Convention No. 29, Article No. 2 (1930). Over the past 40 years, the ILO has repeatedly condemned Burma's record of imposing forced labor on its people contrary to Convention 29. In 1996, for only the tenth time in its almost 80 year history, the ILO established a Commission of Inquiry to investigate allegations concerning Burma's noncompliance with Convention 29. On July 2, 1998, the Commission issued its report. This report acknowledges that the definition of slavery has historically been a narrow one, but then states that the term "slavery" now encompasses forced labor.

> In international law, the prohibition of recourse to forced labour has its origin in the efforts made by the international community to eradicate slavery, its institutions and similar practices, since forced labour is considered to be one of these slavery-like practices.... Although certain instruments, and particularly those adopted at the beginning of

the nineteenth century, define slavery in a restrictive manner, the prohibition of slavery must now be understood as covering all contemporary manifestations of this practice.

*Forced Labour in Myanmar (Burma): Report of the Commission of Inquiry Appointed Under Article 26 of the Constitution of the International Labour Organization to Examine the Observance by Myanmar of the Forced Labour Convention, 1930 (No. 29),* ILO, Part IV.9.A ¶ 198 (1998).

Unocal cites the Supreme Court's 1916 opinion in *Butler v. Perry,* 240 U.S. 328, 36 S.Ct. 258, 60 L.Ed. 672 (1916), to support its argument that governments are permitted to utilize forced labor for the public good. In *Butler,* a Florida statute which forced residents to work on roads and bridges for ten hours a day for six days a year or to pay $3, was challenged under the 13th Amendment. *Id.* at 329–30, 36 S.Ct. 258. The Supreme Court, in upholding the statute, stated that it is "well settled that, unless restrained by some constitutional limitation, a state has inherent power to require every able-bodied man within its jurisdiction to labor for a reasonable time on public roads near his residence without direct compensation. This is a part of the duty which he owes the public." *Id.* at 330, 36 S.Ct. 258.

Unocal's public service argument is not compelling. There is ample evidence in the record linking the Myanmar government's use of forced labor to human rights abuses. The use of forced labor by the states of the United States during the early years of the twentieth century is hardly analogous to the nature of the forced labor utilized by SLORC in recent years. Moreover, there is an issue of fact as to whether the forced labor was used to benefit the Project as opposed to the public's welfare.

**6. *Unocal's Role in the Forced Labor***

■ To prevail on their ATCA claim against Unocal, Plaintiffs must establish

that Unocal is legally responsible for the Myanmar military's forced labor practices. Plaintiffs contend that under international law principles of direct and vicarious liability, Unocal is legally responsible for the Myanmar military's forced labor practices. Specifically, Plaintiffs cite three decisions issued by United States Military Tribunals after World War II involving the prosecution of German industrialists for their participation in the Third Reich's slave labor policies. Plaintiffs argue that under these holdings, knowledge and approval of acts is sufficient for a finding of liability.

During World War II, German industrial firms found themselves caught between the Nazi government's fixed production quotas and a severe wartime labor shortage. In 1942, the Reich Labor Office implemented a massive slave-labor program utilizing foreign civilians, prisoners of war, and concentration camp inmates. The German government compelled German factories to employ the slave-laborers and severely punished industrialists for failing to meet the production quotas.

After Germany's defeat, the four victorious Powers, the United States, Great Britain, France, and Russia formed a "Control Council" composed of the four Commanders–in–Chief, to act as the supreme governing body of Germany. *See Flick v. Johnson*, 174 F.2d 983, 984 (D.C.Cir.1949). In order to establish a uniform legal basis in Germany for the prosecution of war criminals and other offenders of international law, the Control Council enacted Law No. 10. *Id.* Control Council Law No. 10 recognized many international crimes and vested in the Commander for each zone the authority to determine and designate, for his zone, the tribunal by which accused persons should be tried and the rules and procedure to govern in such cases. *Id.* Pursuant to Law No. 10, the Zone Commander for the American Zone of Occupation established six U.S. Military Tribunals which conducted twelve trials before American civilian judges. The defendants in these proceedings were promi-

nent figures in Hitler's Germany and included diplomats and politicians, military leaders, SS leaders, professionals, and jurists. Three of these twelve cases involved the prosecution of German industrialists charged with war crimes and crimes against humanity relating to slave labor and to the plunder and expropriation of property in occupied countries.

In the first of the three industrialist cases, *United States of America v. Friedrich Flick*, "The Flick Case," 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10 (1952), Frederick Flick, a dominant figure in the German steel industry, and five of his business associates, were charged with participating in the Third Reich's slave labor program. The Tribunal concluded that four of the six defendants were entitled to the affirmative defense of necessity and were therefore not guilty. In reaching its decision, the Tribunal acknowledged that the German slave labor program was created and supervised by the Nazi government and that it would have been futile and dangerous for these defendants to have objected. *Id.* at 1196–97. Two of the defendants were convicted. The Tribunal found that Bernhard Weiss, with the knowledge and approval of his superior Frederick Flick, sought an increase in the factory's production quota of freight cars and attempted to procure a corresponding increase in his firm's allotment of forced laborers. *Id.* at 1202. These active steps to participate in the Reich's slave labor program, reasoned the Tribunal, deprived these two defendants of the necessity defense. *Id.*

In the second industrialist case, *United States of America v. Carl Krauch*, "The Farben Case," 8 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, (1952), twenty-three members of I.G. Farben, a German chemical and pharmaceutical company, were tried for utilizing slave labor. Like the Flick defendants, the Farben defendants invoked the necessity defense and

testified that they were under such oppressive coercion and compulsion that they cannot be said to have acted with criminal intent. *Id.* at 1174. The Tribunal found five of the defendants guilty on grounds that they, "like Weiss and Flick, were not moved by a lack of moral choice, but, on the contrary, embraced the opportunity to take full advantage of the slave-labor program. Indeed, it might be said that they were, to a very substantial degree, responsible for broadening the scope of that reprehensible system." *Id.* at 1179. The Tribunal further found that defendant Krauch was "a willing participant in the crime of enslavement." *Id.* at 1189. As for the balance of the defendants, the Tribunal found that they all knew that forced labor was being utilized and that they acquiesced in this practice under the Reich's pressure. *Id.* at 1193. However, because these defendants did not exercise initiative in obtaining forced labor, they were acquitted. *Id.*

Finally, in *United States of America v. Alfried Felix Alwyn Krupp von Bohlen und Halbach,* "The Krupp Case," 9 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, (1950), the defendants were twelve members of the Krupp organization, a German company in the business of producing steel and iron products. The Tribunal found the defendants guilty of employing slave labor because their will was not overpowered by the Third Reich "but instead coincide[d] with the will of those from whom the alleged compulsion emanate[d]." *Id.* at 1439. Moreover, the "Krupp firm had manifested not only its willingness but its ardent desire to employ forced labor." *Id.* at 1440.

The Court disagrees with Plaintiffs that these cases hold that an industrialist is liable where he or she has knowledge that someone else would commit abuses. Rather, liability requires participation or cooperation in the forced labor practices. In the *Flick* Case, Weiss took "active steps" with the "knowledge and approval" of his superior to procure forced laborers so that the company could increase its production quota. The Tribunal's guilty verdict rested not on the defendants' knowledge and acceptance of benefits of the forced labor, but on their active participation in the unlawful conduct.

Plaintiffs also argue that *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424 (D.N.J. 1999), supports their argument that Unocal is liable for the Myanmar military's forced labor practices. In *Iwanowa,* the plaintiff alleged that after being abducted by Nazi troops and transported from Rostov, Russia to Germany, Ford Werke, a German subsidiary of Ford Motor Co., purchased her and forced her to perform heavy labor from 1942 until Germany surrendered in 1945. *Id.* at 433–34. The district court denied Ford's motion to dismiss for lack of jurisdiction, finding there to be jurisdiction for the plaintiff's claims of slave labor under the ATCA. The court held that Ford Werke's "use of unpaid, forced labor during World War II violated clearly established norms of customary international law." *Id.* at 440.

In this case, there are no facts suggesting that Unocal sought to employ forced or slave labor. In fact, the Joint Venturers expressed concern that the Myanmar government was utilizing forced labor in connection with the Project. In turn, the military made efforts to conceal its use of forced labor. The evidence does suggest that Unocal knew that forced labor was being utilized and that the Joint Venturers benefitted from the practice. However, because such a showing is insufficient to establish liability under international law, Plaintiffs' claim against Unocal for forced labor under the Alien Tort Claims Act fails as a matter of law.

## C. *RICO*

 Plaintiffs also allege a claim under RICO. Specifically, Plaintiffs allege that Unocal is liable under RICO for conspiring with the Burmese military to obtain forced labor for the Yadana project. Unocal ar-

gues that RICO does not apply when, as here, the alleged conduct occurred extraterritorially.

The RICO Act is silent regarding its extraterritorial application. In determining the extraterritorial application of RICO, courts seek guidance from "precedents concerning subject matter jurisdiction for international securities transactions and antitrust matters." *North South Finance Corp. v. Al–Turki*, 100 F.3d 1046, 1051 (2d Cir.1996). To determine jurisdiction in securities cases, courts apply two alternative tests: the "conduct test" or the "effects test." *Butte Mining PLC v. Smith*, 76 F.3d 287 (9th Cir.1996). Under the "conduct test," the court has subject matter jurisdiction "where conduct material to the completion of the fraud occurred in the United States." *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1046 (2d Cir.1983). "Mere preparatory activities, and conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction." *Id.* Instead, "[o]nly where conduct 'within the United States directly caused' the loss will a district court have jurisdiction...." *Id.* (citations omitted). Under the "effects test," the court has jurisdiction "whenever a predominately foreign transaction has substantial effects within the United States." *Consolidated Gold Fields PLC v.. Minorco, S.A.*, 871 F.2d 252, 261–62 (2d Cir.1989). Accordingly, remote or indirect effects in the United States do not confer subject matter jurisdiction. *Id.*

In this case, Plaintiffs allege that substantial acts in furtherance of the Project occurred within the United States, including communications concerning Unocal's participation in the Yadana Project, finance meetings held in Los Angeles, and Unocal's transfer of significant monies for Project activity in Burma. The Court finds, however, that these preparatory activities are insufficient to establish subject matter jurisdiction under RICO.

### D. *Federal Question Statute*

Plaintiffs also contend that 28 U.S.C. § 1331 provides an independent basis for subject matter jurisdiction over their claims for violations of international law. Under section 1331, "[t]he districts courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties or the United States." 28 U.S.C. § 1331. Plaintiffs contend that the law of nations is incorporated into the federal common law, *see* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3563 (2d ed.1990) (*citing* Moore, *Federalism and Foreign Relations*, 1965 Duke L.J. 248, 291–97), and is thus part of the laws of the United States for purposes of section 1331. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972) (holding that section 1331 will provide jurisdiction for a claim under the federal common law).

In this case, the determination as to whether Plaintiffs' ATCA claim survives the instant motion also determines whether Plaintiffs' claims under the law of nations survives. *Guinto v. Marcos*, 654 F.Supp. 276, 278–79 (S.D.Cal.1986) (*citing Tel–Oren*, 726 F.2d at 779–80 n. 4). The Court has already determined that Plaintiffs' international law claims under the ATCA fail as a matter of law. For these reasons, the Court also finds that section 1331 does not independently provide jurisdiction in this court.

### E. *State Law Claims*

Having determined that summary judgment should be granted on all of Plaintiffs' federal claims, the Court must decide whether to exercise supplemental jurisdiction over the pendent state law claims. Under 28 U.S.C. § 1367(c), the Court may decline to exercise supplemental jurisdiction over state law claims if all the federal claims have been dismissed. The decision whether to retain or dismiss state claims after dismissal of all federal claims is "fully discretionary." *Schneider v. TRW, Inc.*, 938 F.2d 986, 993–94 (9th Cir.1991). However, in the usual case

where federal claims are dismissed before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state law claims. *Reynolds v. County of San Diego,* 84 F.3d 1162, 1171 (9th Cir.1996). Accordingly, the Court declines to exercise its discretion to retain the state law claims and dismisses those claims without prejudice.

## IV. *Conclusion*

For the reasons set forth above, Unocal's motion for summary judgment as to Plaintiffs' federal claims is **GRANTED** and Plaintiffs' state law claims are dismissed without prejudice.

**IT IS SO ORDERED.**